**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **AARON DAVIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.: _______________** |
| **v.** | ) | |
| | ) | **Jury Demand** |
| **TONY J. CAVENDER, THE JONES COMPANY OF TENNESSEE, LLC, AND OTTER CREEK HOLDINGS, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

Plaintiff Aaron Davis, ("Plaintiff"), by and through undersigned counsel, herby alleges as follows:

## NATURE OF THE ACTION

1. Plaintiff brings this citizens suit against Defendants Tony J. Cavender, The Jones Company of Tennessee, LLC, and/or Otter Creek Holdings, LLC (collectively the "Defendants") pursuant to Section 505(a)(1) of the federal Clean Water Act ("CWA" or the "Act"), as amended, 33 U.S.C. § 1365(a)(1) and (b)(1)(A).

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over the claims set forth in this Complaint pursuant to the citizen suit provisions of Section 505(a) of the CWA, 33 U.S.C. § 1365(a), and federal question jurisdiction pursuant to 28 U.S.C. §1331.

3. Plaintiff has complied with Section 505(b)(1)(A) of the CWA, 33 U.S.C. § 1365(b)(1)(A), which requires pre-suit notice.

4. On August 11, 2020, Plaintiff mailed a notice of intent to file this action under the CWA to the named Defendants, the Administrator of the U.S. Environmental Protection Agency ("USEPA"), the Regional Administrator of USEPA Region 4, and the Commissioner of the Tennessee Department of Environment and Conservation ("TDEC"). A copy of the notice is attached as Exhibit A.

5. More than sixty days have passed since Plaintiff sent the notice letter.

6. The violations identified in the notice letter and in this complaint are continuing at this time and will continue in the future absent a court order for corrective action.

7. Neither USEPA nor TDEC has commenced, nor are they diligently prosecuting a civil or criminal action in a court of the United States to redress the violations of the CWA by Defendants that were identified in the notice letter.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and 33 U.S.C. §1365(c)(1). The CWA violations alleged here have occurred and are occurring in the Middle District of Tennessee.

**PARTIES**

9. Davis is a property owner downstream from Defendants' real estate development project, owning approximately 10.44 acres located in Williamson County Tennessee as described fully in Warranty Deed Book 251, Page 804, in the office of the Register of Deeds for Williamson County, Tennessee, and also identified as Parcel 7.00 on Tax Map 95 in the Williamson County Assessor's office.

10. Defendants are the owners, developers and builders of residential real property known as Otter Creek Springs, Phase 1.

11. Defendant Cavender is a natural person who, upon information and belief, resides in the State of Tennessee and manages the development of Otter Creek Springs, Phase 1.

12. Defendant The Jones Company of Tennessee, LLC is a Missouri limited liability company with its principle address being 16141 Swingley Ridge Road, Suite 109 Chesterfield, MO 63017-1778. The Jones Company of Tennessee, LLC can be served through its agent for service of process, CT Corporation System, 300 Montvue Road, Knoxville, TN 37919.

13. Otter Creek Holdings, LLC is a domestic limited liability company with its principle address being 747 High Point Ridge Road, Franklin, TN 37069. Otter Creek Holdings, LLC can be served through its agent for service of process, Thomas N. Jones, 339 Main Street, Franklin, TN 37064.

14. Defendants The Jones Companies and Otter Creek Holdings, are "persons" within the meaning of 33 U.S.C. § 1362(5) and 1365(a).

## STATUTORY BACKGROUND

15. Section 301(a) of the CWA, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants from a point source into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits such discharges not authorized by, or in violation of the terms of, a . National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

16. Among other things, Section 301(a) prohibits such discharges not authorized by or in violation of the terms of, a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the CWA, 33 U.S.C. § 1342.

17. The CWA prohibits the discharge of pollutants to waters of the United States, except in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to § 402 of the Act. 33 U.S.C. §§ 1311(a), 1342(a).

18. The State of Tennessee has been delegated the authority to implement the permitting programs of the Act by the EPA, including the NPDES permit program, pursuant to 33 U.S.C. § 1342(b). TDEC is the water pollution control agency for purposes of the Act, and has drafted regulations pursuant to that authority implementing the Act's permitting programs within the State of Tennessee. See Tenn. Code Ann. § 69-3-105(h)(1).

19. Each violation of an NPDES permit-and each discharge of a pollutant that is not authorized by such permit-is a separate violation of the CWA. 33 U.S.C. § § 1311(a); 1342(a); 1364(f)(6).

20. Pursuant to Tenn. Code Ann. § 69-3-105(a)(1), all waters of the State of Tennessee have been classified by the Tennessee Water Quality Control Board for suitable uses.

21. Chapter 1200-4-3 of the Rules of the Tennessee Department of Environment and Conservation set forth the General Water Quality Criteria for all waters of the State of Tennessee. Rule 1200-3-3.03 provides the water quality criteria for water uses, and Rule 1200-4-3.03(3) provides, in pertinent part:

> (3) Fish and Aquatic Life
>
> > (d) Turbidity, Total Suspended Solids, or Color-There shall be no turbidity, total suspended solids or color in such amounts or of such character that will materially affect fish and aquatic life….
> >
> > (h) Other Pollutants-The waters shall not contain other pollutants that will be detrimental to fish or aquatic life.

22. The CWA defines a "point source" as "any discernible, confined, and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, [or] container…from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

23. New River and the unnamed tributaries are waters of the United States.

24. A citizen suit, pursuant to 33 U.S.C. § 1365(a)(1), may be brought for violations pertaining to a standard of performance. 33 U.S.C. § 1365(f)(5).

## GENERAL ALLEGATIONS

25. Defendants currently possess coverage under the state's General NPDES Permit for Discharges of Stormwater Associated with Construction Activities, a National Pollutant Discharge Elimination System ("NPDES") permit from the Tennessee Department of Environment with Tracking Number TNR 242369 and an Aquatic Resource Alteration Permit ("ARAP") NR2004 for activities to be conducted on some portions of the Site.

26. On July 8, 2020, the TDEC inspected the Site, its stormwater pollution prevention plan (SWPPP), erosion prevention sediment controls (EPSCs), inspection reports and best management practices (BMPs) for compliance with the Construction Stormwater Permit.

The following violations were found:

a) EPSCs were missing at Lots 13, 18, 22 and 23 and filters in the storm drains in front and near those lots were clogged with sediment and gravel resulting in sediment entering the open drain on the curb. Furthermore, filters in storm drains all across the Site were not maintained;

b) The SWPPP and inspection sheets were not available during the inspection and the NOC posting could not be located (CGP 3.3.3, 3.5.8.2.g);

c) A drainage area south of the Ragland Place construction area had channels that were unstable resulting in erosion (CGP 3.5.3.2);

d) Work on the sediment basin was incomplete and structural failure has occurred resulting in the discharge of sediment into Niblet Creek and/or some of the tributaries to Niblet Creek and eventually discharging sediment to Hunting Camp Creek and the South Harpeth River, which is considered Waters of the State (WOTS) and waters of the United States. The sediment basin had not been maintained and was over 50% capacity. The weir in the sediment basin was incomplete and the rock filter and PVC cap for the riser was missing as required in the SWPPP plan sheets. As a result, a large amount of sediment from the storm drains, unstabilized drainage channels and a large disturbed, unstabilized area to the north of the sediment basin had discharged trough the inlet (weir and riser). The sides of the sediment basin and areas around were unstable resulting in sediment discharge outside of the basin and into WOTS. The sediment basin is inadequate resulting in heavy erosion downgradient, resulting in additional sediment discharges to Hunting Camp Creek and the South Harpeth RIver;

e) Construction was observed outside of the approved Limit of Disturbance (LOD) for permit tracking no. TNR242369. Construction in Lots 33 through 38 were in process and construction and land clearing along Swindon Road and Flatrock Road were in process. These areas were previously identified in the SWPPP for permit tracking no. TNR242369 as part of Phase 2. An NOI and SWPPP were received for Phase 2 citing permit tracking no. TNR243864, but Phase 2 was deemed to be incomplete and a Notice of Coverage (NOC) had not been issued; therefore, all discharges relating to Phase 2 are unpermitted discharges pursuant to the CWA. Notably, the permit application submitted to the TDEC

for Phase 2 was for construction of Lots 39-53, and 138-157, which is south of the area that was disturbed and noted during the July 8, 2020 inspection. All discharges related to Lots 33 through 28 are unpermitted discharges into Niblet Creek and its tributaries for which the Defendants failed to apply for and obtain a discharge permit from the TDEC. To Plaintiff's knowledge, the Defendants have failed to submit an NOI and SWPPP to the TDEC authorizing disturbance of this additional area.

f) Defendants failed to submit a site assessment has not been received for each outfall draining 10 or more acres as required by the NOC and CGP. As required by CGP section 3.1.2, "*Site assessments shall cover the entire disturbed area and occur within 30 days of construction commencing at each portion of the Site that drains the qualifying acreage.*"

27. Additionally, Defendants failed to obtain a permit for its ongoing land clearing and construction activities being conducted along Swindon Road and Flatrock Road on Lots 33 through 38. Defendants have failed to submit an NOI and SWPPP for this disturbed area. The Site has little or no sediment control structures and is discharging pollutants into navigable waters via discreet discharge points without an NPDES permit. Defendants have not followed best management practices designed to minimize water quality impacts.

28. The CWA prohibits the discharge of pollutants to waters of the United States, except in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to § 402 of the Act. *See* 33 U.S.C. §§ 1311(a), 1342(a). The rivers and streams degraded by discharges from Defendants are Niblet Creek and its tributaries, Hunting Camp Creek, and the South Harpeth River which are considered jurisdictional waters of the United States under the CWA. Rock, sand and dirt, which are the primary components of sediment, are specifically listed as pollutants pursuant to CWA. See 33 U.S.C. § 1362(6). Defendants are

discharging sediment into navigable waters and have failed to comply with their general NPDES permit and has expanded their operations to areas outside of the permitted area.

29. Silt, sand, and sediment have been and are observable in nearby streams as the result of Defendants' failure to property design, install and operate control measures and sediment basins resulting in large amounts of sediment-laden discharges into Niblet Creek and its tributaries and on to downstream waters from the discreet discharge point sources. These discharges occurred as early as June 29, 2020, July 8, 2020, July 16, 2020, July 31, 2020, August 15, 2020, August 18, 2020, August 28, 2020, September 2, 2020 and September 13, 2020, and are likely to continue.

30. Each of these discrete conveyances of sediment discharges to waters of the United States, is a point source, subject to regulation under the CWA. The regulatory definition of discharge of a pollution from a point source expressly includes, "additions of pollutants into waters of the United States from . . . surface runoff which is collected or channeled by man." 40 CFR 122.2. *See* North Carolina Shellfish Growers Ass'n v. Holly Ridges Assoc., 278 F.Supp.2d 654, 679-80 (E.D.N.C. 2003) (finding failed sediment traps, ditches, gullies, and rills to be point sources); United States v. Law, 979 F.2d 977, 980 (4th Cir. 1992) (finding section 402 applicable to system collecting polluted runoff and channeling it to waters of the United States); Concerned Area Residents for the Env't v. Southview Farm, 34 F.3d 114, 119 (2nd Cir. 1994) (finding 402 permit required for polluted runoff that was channeled by natural depression into nearby ditch which discharged to stream). Defendants have failed to properly maintain adequate erosion controls which have created discreet discharge points.

31. In addition to ongoing daily and weekly violations related to installing and maintaining adequate controls and required inspections, violations as the result of muddy discharges causing

significant contrast and impacts to downstream waters occurred on at least the following dates June 29, 2020, July 8, 2020, July 16, 2020, July 31, 2020, August 15, 2020, August 18, 2020, August 28, 2020, September 2, 2020 and September 13, 2020, and are likely to continue.

32. Additional streams located on Defendants' property, which the Plaintiff does not have access to assess, are navigable waters pursuant to the CWA. Sections 401 and 404 of the CWA require a permit from the U. S. Corps of Engineers prior to the discharge of dredged or fill materials into waters of the United States. 33 U.S.C. §§ 1311, 1344. Sediment is a pollutant under Section 502(6) of the CWA, 33 U.S.C. 1362(6). Disposal of sediment into navigable waters of the United States constitutes the discharge of fill material as defined in Section 404 of the CWA, 22 U.S.C. 1344 and under the U. S. Army Corp of Engineers' implementing regulations codified at 33 C.F.R. Part 323. Defendants' land clearing operations and other construction activities on the Site are continuing to create outlets, outfalls, and gullies, causing the ongoing discharge and filling of dredged or fill material into waters of the United States. These discharges exceed incidental fallback. *See* United States v. Deaton, 209 F.3d 331 (4th Cir. 2000); see also, 65 Fed. Reg. at 50109-50111 (August 16, 2000).

33. The illegal placement of fill material continues to occur today and constitutes a continuing violation until the illegally placed fill material is dredged and removed from the navigable waters. The Defendants are subject to civil penalties and injunctive relief to address and eliminate the violations under Section 505(a)(1) of the CWA and payment of the Plaintiff costs of litigation including attorney's fees under 505(d) of the CWA, 33 U.S.C. 1365(a)(1).

34. Defendants are continuing to conduct construction activities on the Site. Discharge of fill includes the addition of any material to a water of the United States which has the effect of "[r]eplacing any portion of a water of the United States with dry land" or '[c]hanging the bottom

elevation of any portion of a water of the United States." See 33 C.F.R. § 323.2(e) and (f). Examples of fill material include "rock, sand, soil, clay." See 33 C.F.R. § 323.2(e). The Defendants construction activities constitute discharges of fill material regulated by the CWA to which Defendants have failed to seek a permit. Pursuant to Section 402 of the CWA, no person may discharge pollutants from a point source to waters of the United States unless in compliance with a discharge permit issued by the U.S. EPA or a delegated state NPDES program. The State of Tennessee has a delegated NPDES program. The Defendants are conducting work on Lots 33 through 38 and other areas in Phase II; yet, the Defendants have never submitted an application for a permit to discharge sediment emanating from those lots as these lots are outside of the disturbed areas Defendants obtained a permit to disturb. (See July13, 2020 letter.)

35. Defendants operations are causing violations of Tennessee water quality standards. The Tennessee Department of Environment and Conservation ("TDEC") classifies water bodies according to the uses a water body is to support and mandates minimum water quality standards and criteria necessary to sustain those uses. TDEC classifies the receiving waters as supporting the following uses: Domestic Water Supply (DOM); Fish and Aquatic Life (FAL); Recreation (REC); Livestock Water and Wildlife (LWW); and Irrigation (IRR). See TDEC Rule 0400-40-04, Use Classifications for Surface Waters.

36. For each use classification, Tennessee has established minimum water quality standards and criteria. Because the receiving waters are subject to multiple use classifications, the most stringent criteria apply. See Tenn. Comp. R. and Regs. 0400-4-4-.02. For waters designated for supporting fish and aquatic life as here, the regulations provide that "[t]here shall be no turbidity or color in such amounts or of such character that will materially affect fish and aquatic life." See Tenn. Comp. R. and Regs. 0040-4-4-.03(3)(d). Similarly, for recreational waters, the regulations

provide that "[t]here shall be no turbidity or color in such amounts or character that will result in any objectionable appearance to the water, considering the nature and location of the water." See Tenn. Comp. R. and Regs. 0040-4-4-.03(4)(d).

37. Defendants are causing Niblet Creek and its tributaries to violate each of these standards and criteria. This excessive turbidity is materially affecting designated uses.

38. The continued sedimentation of Niblet Creek and the other impacted streams and rivers violates a requirement under Tennessee law that "[n]o pollution, including…any deleterious…substance of activity, shall be…allowed to run into, wash into or take place in any waters, either private or public, in a manner injurious to fish life or other aquatic organisms, or that could be injurious to fish life or other aquatic organisms, or that could be injurious the propagation of fish, or that results in the destruction of habitat for fish and aquatic life. See Tenn. Code Ann. § 70-4-206.

## CLAIMS

### Count 1: Violation of the terms of the Clean Water Act

**Unpermitted discharge of pollutants (sediment, dredge/fill material) into streams and rivers**

39. Paragraphs 1 to 37 of this complaint are hereby realleged and incorporated by reference.

40. The regulatory definition of discharge of pollution from a point source expressly includes, "additions of pollutants into waters of the United States from…surface runoff which is collected or channeled by man." 40 CFR 122.2.

41. Point sources are discrete conveyances such as pipes or man-made ditches

42. The Site has one or more point sources which discharge sediment to nearby streams and tributaries.

43. Sediment is collected in the streams and tributaries and then discharged as a point source to other waters.

44. Each discrete conveyances of sediment to waters of the United States is a point source subject to regulation under the Clean Water Act.

45. Ongoing discharges from the Site corrupt rivers and streams including Niblet Creek and its tributaries

46. Under the CWA, the above-mentioned rivers and streams are navigable waters and jurisdictional waters of the United States.

47. 33 U.S.C. § 1362(6) specifically lists sand and dirt, which are the primary components of sediment, as pollutants.

48. The deposit of dredged and fill material and other pollutants into United States waters is the exact type of discharge barred by the CWA. CWA § 401-404; 33 U.S.C. §§ 1311, 1344.

49. Field turbidity testing showed sediment and suspended solids which exceed Tennessee standards.

50. Photos show turbid waters in Niblet Creek and its tributaries.

51. The Clean Water Act bars turbidity that affects aquatic habitation.

52. Defendants' discharges also lead to devastation of recreation in Niblet Creek and its tributaries.

53. Recreation includes fishing, sightseeing and water-related recreation. CWA Section 404(b) § 230.52(a).

54. Defendants are causing the ongoing discharge of dredged or fill material into waters of the United States due to Defendants' construction activities.

55. The muddy construction-related material is carried downstream where it is reintegrated in the stream bed. This redeposit is the discharge of dredged material under the Clean Water Act.

56. Discharge of fill material is ongoing due to Defendants' placement of sediment in Niblet Creek and its tributaries occurs when the stormwater detention pond carries sediment and dirt from the trails and discharges it into the impacted streams.

57. Disposal of sediment into navigable waters of the United States constitutes the discharge of fill material under the CWA.

58. "The disposal of dredge or fill material may adversely modify or destroy water use for recreation by changing turbidity, suspended particulates, temperature, quality of habitat, and the aesthetic qualities of sight, taste, odor and color." CWA Section 404(b) § 230.52(a).

59. Illegal placement of dredge and fill material and other pollutants continues to occur and constitutes a continuing violation until the illegally placed pollutants are removed from the navigable waters.

60. Defendants' unpermitted discharges of dredge and fill material, and other pollutants, from multiple point sources, into waters of the United States, which affect aquatic life and recreation, violates the CWA and the Court must award damages accordingly.

**Count 2: Violation of the terms of the United States Army Corps of Engineers Standards**

61. Paragraphs 1 to 59 of this complaint are hereby realleged and incorporated by reference.

62. Sections 401 and 404 of the CWA require a permit from the Corps of Engineers prior to the discharge of dredge or fill materials into waters of the United States. 33 U.S.C. §§ 1311, 1344.

63. Defendants are causing the discharge of dredged or fill material into waters of the United States.

64. Discharge of fill material is ongoing due to Defendants' placement of sediment in Niblet Creek and its tributaries with the bulldozer and also occurs when the stormwater detention pond carries sediment and dirt from the trails and discharges it into the impacted streams.

65. Discharge of fill includes the addition of any material to a water of the United States which has the effect of "replacing any portion of a water of the United States with dry land". 33 C.F.R. § 323.2(e) and (f).

66. Examples of fill material include "rock, sand, soil, clay." 33 C.F.R. § 323.2(e).

67. Disposal of sediment into navigable waters of the United States constitutes the discharge of fill material under the United States Army Corp of Engineers Implementing Regulations. 33 C.F.R. § 323.

68. The Discharge of fill material into waters of the United States without a permit violates the implanting standards of the United States Army Corps of Engineers. 33 C.F.R. § 323.

69. Defendants are in violation of the implementing standards of the United States Army Corps of Engineers and the Court must award damages accordingly.

**Count 3: Violation of the terms of the Tennessee Water Quality Standards**

70. Paragraphs 1 to 68 of this complaint are hereby realleged and incorporated by reference.

71. "All discharges of sewage, industrial waste , and other waste shall receive the degree of treatment or effluent reduction necessary to comply with water quality standards, or state federal laws and regulations pursuant thereto, and where appropriate will comply with the "Standards of Performance" as required by the Tennessee Water Quality Control Act. (T.C.A. §§ 69-31-101, et seq.).

72. Defendants' discharge laden operations, including continued sedimentation of Niblet Creek and its tributaries, are violating Tennessee Water Quality Control standards.

73. Defendants' activities are degrading water quality in the Niblet Creek and its tributaries within the meaning of TN Water Quality Control Standards Chapter 0400-40-03-.04(3).

74. Site visits on June 29, 2020, July 8, 2020, July 16, 2020, July 31, 2020, August 15, 2020, August 18, 2020, August 28, 2020, September 2, 2020 and September 13, 2020 by TDEC and Plaintiff reveal Defendants' activities are degrading the water in violation of Tennessee Water Quality Control Standards.

75. Field turbidity testing on collected solid samples reveal sediment and suspended solids.

76. The turbid waters from Defendants' activities are devastating aquatic life and habitat in the Niblet Creek and its tributaries.

77. Niblet Creek and its tributaries are muddy and overwrought with sediment, leading to an objectionable appearance in the water.

78. Niblet Creek and its tributaries reveal turbid waters.

79. Clear water is found in streams upstream of Defendants' activities.

80. Niblet Creek and its tributaries and surrounding tributaries are designated for supporting aquatic life.

81. The excessively high solid samples, and high turbidity levels violate Tennessee water quality standards because they disrupt fish and aquatic life.

82. Tennessee Water Quality Control Standards prohibit visible solids, floating materials and deposits on these waters. Regarding solids, floating materials and deposits Tennessee water quality standards hold that, "There shall be no distinctly visible solids, scum, foam, oily slick, or the formation of slimes, bottom deposits, or sludge banks of such size or character that may be detrimental to fish and aquatic life." (TN Water Quality Control Standards Chapter 0400-40-04-.04(3)(c)).

83. Tennessee Water Quality Control Standards also prohibit turbidity, total suspended solids or color on these waters. Pertaining to turbidity, total suspended solids, or color, Tennessee water quality control standards hold that, "There shall be no turbidity, total suspended solids, or color in such amounts or of such character that will materially affect fish and aquatic life." (TN Water Quality Control Standards, Chapter 0400-40-03-.03(d)).

84. "For waters designated for supporting aquatic life, there shall be no turbidity that will materially affect fish and aquatic life". (Tenn. Comp. R. and Regs. 1200-4-4-.04(d).

85. Further, Tennessee water control standards hold that, "no pollution including…any deleterious…substance of activity, shall be allowed... to run into, wash into or take place in any waters, either private or public, in a manner injurious to fish life or other aquatic organisms, or that could be injurious to fish life or other aquatic organisms, or that could be injurious to the propagation of fish, or that results in the destruction of habitat for fish and aquatic life. Tenn. Code Ann. § 70-4-206.

86. Therefore, turbidity from Defendants' activities and operations which disrupt fish and aquatic life is in violation of Tennessee water quality standards.

87. Furthermore, the excessively high solid samples, and high turbidity levels from Defendants' discharges, also violate Tennessee water quality standards because they disrupt recreation and recreational use of these waters.

88. "The disposal of dredged or fill material may adversely modify or destroy water use for recreation by changing turbidity, suspended particulates, temperature, quality of habitat, and the aesthetic qualities of sight, taste, odor and color". CWA Section 404(b) § 230.52(a).

89. The CWA's definition for recreation includes consumptive use, such as fishing and non-consumptive use, such as sight-seeing. CWA 404(b) § 230.52(a).

90. Eyewitness, photographic accounts reveal ongoing observations of brown, murky, opaque water.

91. Additionally, some of these waters, such as Niblet Creek and its tributaries are crucial to recreation as they encourage sightseeing and nature observances.

92. Regarding recreation, Tennessee water quality standards hold that "There shall be no distinctively visible solids, scum, foam, oily slick, or the formation of slimes, bottom deposits, or sludge banks, of such size or character that may be detrimental to recreation. TN Water Quality Control Standards Chapter 0400-40-03-.03(4)(c).

93. Pertaining to recreation, Tennessee water quality standards hold that, "There shall be no total suspended solids, turbidity, or color in such amounts or character that will result in any objectionable appearance to the water, considering the nature and location of the water. TN Water Quality Control Standards Chapter 0400-40-03-.03(4)(d).

94. Therefore, discharges from Defendants' activities and operations which disrupt recreation is in violation of Tennessee water quality standards and the Court must award damages accordingly.

**Count 4: Violation of the terms of Tennessee Antidegradation Rule**

95. Paragraphs 1 to 94 of this complaint are hereby realleged and incorporated by reference.

96. Disruption of water quality of streams and waters violates the Tennessee antidegradation rule. Tenn. Comp. R. on Regs. 1200-4-3.06.

97. As alleged herein, Defendants are disrupting water quality of streams and waters through unpermitted discharges.

98. Defendants are in violation of the Tennessee antidegradation rule and the Court must award damages accordingly.

**PRAYER FOR RELIEF**

WHEREFORE, based upon the allegations contained in the foregoing paragraphs, Plaintiff respectfully requests the Court grant the following relief:

a. Enter a declaratory judgment that Defendants have violated, and are in violation of, the CWA, United States Army Corps of Engineers Standards, Tennessee Water Control Standards, Tennessee Antidegradation Standards;

b. That this Court empanel a jury of twelve (12) for the purpose of making findings of fact pursuant to the law of the State of Tennessee;

c. Order Defendants to apply for, obtain and comply with an NPDES permit from TDEC for discharges associated with construction activities for each discharge point.

d. Order Defendants to immediately take such steps as are necessary and proper to remedy the harm caused by their violations of the CWA, United States Army Corps of Engineers Standards, Tennessee Water Control Standards, Tennessee Antidegradation Standards;

e. Order Defendants to pay civil penalties not to exceed 37, 500 per violation per day of the CWA per day pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. § § 1319(d) and 135, 1365(a), and 83 Fed. Reg. 1190 (Jan. 10, 2018);

f. Order the Defendants to abate the nuisance, remove the pollutants discharged into waters and award Plaintiff damages for the harm caused by the Defendants' nuisance;

g. Award Plaintiff damages for the harm caused by the Defendant's negligence;

h. Award Plaintiff damages for the harm caused by the Defendant's trespass;

i. Award Plaintiff damages for the harm caused by the Defendant's nuisance;

j. Award Plaintiff damages for the harm caused by the Defendant's vandalism

k. Award Plaintiff costs of litigation, including reasonable attorney and expert witness fees, as authorized by Section 505(d) of the CWA, 33 U.S.C. § 1365(a)(1); and

l. Grant such other and further relief as the Court deems just and proper.

Respectfully submitted, this 12th day of October, 2020.

/s/ C. David Briley
C. David Briley, (BPR #018559)
Bone McAllester Norton PLLC
511 Union Street, Suite 1600
Nashville, TN 37219
(615) 238 6306 Phone
(615) 687-2761 Fax
dbriley@bonelaw.com